Exhibit 12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION


ARMANDO VILLANUEVA and      )
HORTENCIA SAINZ, individually )
and as successor in interest )
to Pedro Villanueva, deceased, )
and FRANCISCO OROZCO,       )
individually,               )
                            )
          Plaintiff,        )
                            )
     vs.                    ) CASE NO: 8:17-cv-
                            )      01302-JLS-KES
                            )
STATE OF CALIFORNIA; et al., )
                            )
          Defendants.       )
_____)


VIDEOTAPED DEPOSITION OF CLARENCE R. CHAPMAN

Taken on

Monday, August 6, 2018


Amber Pilson, CSR 13992

1                    UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

3

4

5    ARMANDO VILLANUEVA and          )
     HORTENCIA SAINZ, individually   )
6    and as successor in interest    )
     to Pedro Villanueva, deceased,  )
7    and FRANCISCO OROZCO,           )
     individually,                   )
8                                     )
                    Plaintiff,        )
9                                     )
          vs.                         ) CASE NO:  8:17-cv-
10                                    )       01302-JLS-KES
                                      )
11   STATE OF CALIFORNIA; JOHN        )
     CLEVELAND; RICH HENDERSON; and  )
12   DOES 1-10, inclusive,           )
                                      )
13                  Defendants.       )
     _____)

14

15

16   VIDEOTAPED DEPOSITION OF CLARENCE R. CHAPMAN, taken

17   on behalf of Plaintiffs, at 21800 Burbank Boulevard,

18   Suite 310, Woodland Hills, California, commencing at

19   1:06 P.M. and terminating at 3:24 P.M., on Monday,

20   August 6, 2018, before Amber Pilson, Certified

21   Shorthand Reporter No. 13992 for the State of

22   California, pursuant to Notice.

23

24

25                      ---oOo---

                                                            2

1    <u>APPEARANCES OF COUNSEL</u>:

2

3    For the Plaintiff, Armando Villanueva and Hortencia
     Sainz:
4
          KIESEL LAW LLP
5         BY:  Bryan Garcia, Esq.
          8648 Wilshire Boulevard
6         Beverly Hills, California 90211
          (310) 854-4444
7         garcia@kiesel.law

8
     For the Plaintiff, Francisco Orozco:
9
          LAW OFFICES OF DALE K. GALIPO
10        BY:  Dale K. Galipo, Esq.
          21800 Burbank Boulevard
11        Suite 310
          Woodland Hills, California 91367
12        (818) 347-3333
          dalegalipo@yahoo.com
13

14   For the Defendant, State of California; John
     Cleveland; Richard Henderson:
15
          DEPUTY ATTORNEY GENERAL
16        BY:  Donna M. Dean, Esq.
          300 South Spring Street
17        Suite 1702
          Los Angeles, California 90013
18        (213) 269-6000
          donna.dean@doj.ca.gov
19

20   Also Present:

21        BEST EVIDENCE VIDEO
          BY: Steven Zucker, Videographer
22

23

24

25

3

```
 1    firearms" -- it's the second sentence --

 2         A    I see it.  I see it.  I have it.

 3         Q    Okay.  Do you generally agree with that

 4    sentence, "The use of firearms against moving motor

13:21 5    vehicles is inherently dangerous and almost always

 6    ineffective"?

 7         A    Yes.

 8         Q    The next sentence says, "For the purposes

 9    of this section, an assaultive moving vehicles shall

13:21 10    not presumptively justify a Department member's use

11    of deadly force."

12              Do you see that sentence?

13         A    Yes, sir.

14         Q    First of all, what is an "assaultive motor

13:21 15    vehicle"?

16         A    Okay.  And this is very important in

17    analyzing this particular policy.  This policy

18    addresses moving motor vehicles, and so we're

19    talking mechanical objects.  We're talking,

13:21 20    literally, 300,000 -- 3,000-pound vehicle, and a

21    bullet is not going to stop a 3,000-pound vehicle

22    under power, in other words, moving with any kind of

23    momentum.

24              The second sentence that comes down that

13:21 25    you reference is what is an assaultive motor
```

17

1  vehicle.  An assaultive motor vehicle is a vehicle

2  moving in an officer's direction with the capability

3  of seriously harming the officer or killing the

4  officer, but it talks about a motor vehicle, and so,

13:22  5  having been a chief of police and -- and one -- and

6  a post instructor who constructs these kinds of

7  policies, we want to instill in the minds of the

8  officers that a motor vehicle is not a living

9  entity.  You cannot hurt a motor vehicle with a

13:22  10  two-ounce bullet.

11      You're -- you're talking two -- I'm sorry,

12  "two ounces" -- I'm talking about two grams against

13  upwards of 5- -- 5,000 pounds for a truck, and --

14  and so that -- I think it forms a foundation for

13:22  15  instilling a proper application within the minds of

16  the officers to how to approach any use of force

17  regarding a motor vehicle.

18      Q   Okay.

19      A   I didn't mean to be so professorial, but I

13:23  20  used to teach this.

21      Q   That's okay.  I'm here to learn.

22          The next sentence says, "A Department

23  member threatened by an oncoming vehicle shall move

24  out of its path instead of discharging a firearm at

13:23  25  it or its occupants, allow the vehicle to pass, and

18

1    utilize other tactical or investigative means to

2    apprehend the suspect."

3            Did you understand that was part of the

4    sheriff's department policy in 2013?

13:23  5        A    Yes.   Yes, I understood that to be part of

6    the policy, and I absolutely support that, not only

7    with sheriff's department, with all police agencies.

8        Q    Why -- do you think that's a good policy?

9        A    I think it's a good policy, yes.

13:23 10        Q    And why do you think that's a good policy?

11        A    Well, let's go back to my previous

12    response:   It's almost impossible, and I think it

13    says always -- "almost always ineffective" to stop

14    two tons with a couple of grams of lead, and so if

13:24 15    that is, in fact, the regard that -- that we're

16    going to take the scientific evidence in that

17    regard, it makes no sense for an officer to stand in

18    the path of a vehicle with nothing in defense but a

19    handgun.   You're not going to stop that vehicle.

13:24 20            If you had a bazooka, maybe, or some kind

21    of a cannon on top of a tank, maybe so, but police

22    departments and officers don't carry that kind of

23    ammunition, and so the best option is to get out of

24    the way if, in fact, the vehicle passes to allow the

13:24 25    vehicle to pass if there is a sufficient

19

1  circumstances that would allow the officers to get

2  out of the way and just let the vehicle go.

3       Q    Okay.  So would you agree that if a officer

4  is threatened by an oncoming motor vehicle and the

13:25  5  officer can move out of its path instead of

6  discharging the firearm, they should do that?

7       A    Yes.

8       Q    Okay.  Is that consistent, generally, with

9  general police training?

13:25 10      A    Yeah, contemporary police training across

11  the country.  I'm a member of the Association of

12  Chiefs of Police, and I still go to their

13  conferences, and that's still, pretty much, the

14  standard of care for defending -- officers defending

13:25 15  themselves against moving vehicles.

16      Q    Okay.  And when it says "Allow the vehicle

17  to pass and utilize other tactical or other

18  investigative means to apprehend the suspect," what

19  might some of those means be?

13:25 20      A    Tactical would be communications, so

21  whenever an officer is on the radio communicating

22  with other units, police units, aerial units,

23  outside agencies, that's a tactical procedure in

24  that regard.  Tactics could also be once that

13:26 25  individual vehicle who has fled is -- is -- is

20

1   located, then there can be area containments.  There

2   can be tire strips that can be thrown out to disable

3   the car.

4         Those are all part of tactics, but

13:26 5   investigative means is something a little bit

6   different, and it departs from tactical in the -- in

7   the context that police agencies have the capability

8   to access certain databases, and so what the

9   officers knew at the time, the description of the

13:26 10   car, if they had a license plate number of the car,

11   if they had any indication through that license

12   plate number of the registered owner of the car and

13   the registered owner has any information through the

14   Department of Motor Vehicle database that could

13:26 15   identify a licensed driver, those are the

16   investigative measures that can be undertaken to

17   apprehend a suspect which is obviously the goal in

18   all this.

19         Q   Okay.  Now, in terms of some of the post

13:27 20   standards with regards to the use of deadly force,

21   and some of this, I know we've talked about before.

22   The post learning domains that were in effect at the

23   time of this shooting and the Chapter 3, I think,

24   you designated, talk about deadly force as being a

13:27 25   last resort; is that correct?

21

```
    1          A    Always.

    2          Q    And you agree with that?

    3          A    Yes.

    4          Q    And it also talks about deadly force only

13:27  5   being used in the direst of circumstances?

    6          A    I agree with that.

    7          Q    Okay.   And that's not only part of post

    8   standards, that's part of police officer training;

    9   is that fair?

13:27 10          A    Yes.

   11          Q    And it also talks about the reverence for

   12   human life which we've briefly spoke about already?

   13          A    Correct.

   14          Q    And also the post standards with respect to

13:27 15   the use of deadly force also talk about not using

   16   deadly force if other reasonable measures are

   17   available, and you generally agree with that?

   18          A    Alternatives, yes.

   19          Q    And one of the alternatives, I think, we

13:28 20   talked about in the context of a moving vehicle is

   21   is to step out of the path if you can?

   22          A    That's probably the best alternative.

   23          Q    The post talks about giving a warning that

   24   you're going to use deadly force when feasible?

13:28 25          A    When feasible, yes.   Yes.   If that warning
```

                                                              22

1    can be perceived and understood by the individual,

2    and there's enough time for the individual to comply

3    with that warning.

4         Q    An officer should, in part, consider the

13:28  5    background when firing?

6         A    It's called backdrop, yes.  Backdrop

7    considerations and collateral damage is always

8    tantamount in any decision to use firearms as a

9    defensive method of force.

13:29 10         Q    The Post Learning Domain 20 talks about

11    subject fear alone being insufficient to use force

12    including deadly force?

13         A    Yes.  Subjective fear is basically that

14    fear of the officer has no foundation in any

13:29 15    objective condition that may occur at the time.  In

16    other words, just an individual being afraid of

17    something is not justification to use deadly force.

18         Q    Now, have you reviewed or seen cases

19    before, whether you've been retained or you've seen

13:29 20    a video on television or whatever it might be, where

21    you thought that the officers overreacted by using

22    deadly force?

23         A    Oh, yes.

24         Q    Okay.  And when an officer overreacts in

13:29 25    using deadly force would that be a, at least in your

23

```
 1    mind, a case of excessive force?  In other words,

 2    you don't need some criminal intent to find

 3    excessive force.  You just need an officer

 4    intentionally pressing the trigger and overreacting,

13:30  5    for example?

 6         A   Yes.  I mean, there's a classic video out

 7    on the media right now, Detroit police officers, and

 8    I think there are four -- two officers I know were

 9    fired, but go online, and they are firing at a motor

13:30 10    vehicle, but they fired, literally, 16 rounds at the

11    vehicle as it passed by them and it's leaving.  It's

12    down an alleyway, and I think that's representative

13    of excessive, unnecessary, and unjustified force.

14         Q   Okay.  You saw that video online or on TV

13:30 15    or --

16         A   It just occurred in the last 30 days.

17         Q   Okay.  And in your opinion, that would be

18    a -- a case of excessive force?

19         A   Yes.  In the next class I teach, I'm going

13:30 20    to use that -- that video to show what firing at

21    motor vehicles -- what would constitute an

22    unjustified use of force against a motor vehicle.

23         Q   Generally speaking, under -- as you

24    understand the facts of the Detroit case, can

13:31 25    officers just shoot at the driver of a vehicle for
```

24

```
 1    fleeing?

 2         A    No.    I think that's what I'm talking about.

 3    I think there's not only policy, but there's --

 4    there's some case law against shooting at motor

13:31  5    vehicles that are fleeing.    I know the California

 6    Highway Patrol actually has a policy that thou will

 7    not shoot vehicles fleeing on a freeway --

 8         Q    Right.

 9         A    -- for purposes of apprehension.

13:31 10         Q    And you, as part of the materials you

11    reviewed in this case, you reviewed the depositions

12    of the involved officers?

13         A    Yes.    Sergeant Cleveland and

14    Officer Henderson.

13:31 15         Q    Right.    And did you note in -- in their

16    testimony that either one or both of them indicated

17    that, based on their training, you couldn't shoot

18    this vehicle simply for fleeing under the facts of

19    this case?

13:31 20         A    And I think they both testified under oath

21    if Mr. -- if the driver had driven around them, they

22    would have let him go.

23         Q    Okay.    Do you agree with that, generally,

24    that under the facts of this case, you cannot use

13:32 25    deadly force by shooting the driver just for
```

25

1    fleeing?

2        A    Not only do I agree, I think they were

3    well-trained officers to understand that policy or

4    the aspect of that policy.

13:32  5        Q    Okay.  Are -- are officers generally taught

6    to assess during a shooting sequence when they can,

7    and what I mean by that is I know sometimes it may

8    be difficult to assess with every shot, obviously,

9    but I know back in the day there was some training

13:32 10    with the County either to take two or three shots

11    and assess.

12            Do you recall that general training?

13        A    Well, that is training.  That's not

14    real-life scenario, and it has nothing to do with

13:33 15    policy and defensive force in the face of a deadly

16    threat, but that is training.  That is training.

17        Q    Okay.  What --

18        A    It's a training scenario, and it's actually

19    written up, and it's called a "failure drill" where

13:33 20    you can either take two shots to the body, one to

21    the head, you reassess; two shots to the head, one

22    to the body, you reassess.  It's a training drill.

23    It's not a prescription for how officers are to

24    perform in the field, and I think that's a very

13:33 25    important distinction.

26

```
 1        A    I believe it was in 2001/2002.

 2        Q    Okay.  So in terms of the concept -- we've

 3   talked about this before too -- the acronym IDL,

 4   Immediate Defense of Life?

 5        A    Yes.

 6        Q    So in terms of a moving vehicle, I guess,

 7   the immediate or imminent threat of death or serious

 8   bodily injury would, in that context, would be the

 9   vehicle striking or -- or hitting the officer; is

10   that --

11        A    That's a fair statement.

12        Q    Okay.  So in order for there to be, based

13   on the police training and standards, a

14   justification to use deadly force against the driver

15   of a vehicle, you would need the immediate or

16   imminent threat of death or serious bodily injury,

17   and you would need a scenario where the officer

18   cannot get out of the path of the vehicle?

19             In other words, you would need the

20   imminency of the threat, and if you can look back to

21   Exhibit 1 for a second -- do you still have that?

22        A    Yes, I do.

23        Q    So I'm looking about two thirds of the way

24   down.  It says "A Department member shall not

25   discharge a firearm at a motor vehicle or its
```

29

1    occupants in response to a threat posed solely by

2    the vehicle unless the member has an objectively

3    reasonable belief that" -- and then it has two

4    bullet points:   The first one, "The vehicle or

13:37 5    suspect poses an immediate threat of death or

6    serious physical injury to the Department member or

7    another person," and then it has an "and"

8    underlined, "the Department member has no reasonable

9    alternative course of action to prevent the death or

13:37 10    serious physical injury."

11        Is that your general understanding of the

12    training with respect to shooting at a moving

13    vehicle?

14        A    Yes, sir.

13:38 15        Q    Okay.   So you would need the immediate

16    threat of death or serious bodily injury and no

17    reasonable alternative course of action such as

18    stepping out of the path?

19        A    Very fair statement, yes.

13:38 20        Q    Okay.   And is it your understanding that

21    the -- the CHP policy is generally consistent with

22    the principles we've been talking about with respect

23    to the use of deadly force and shooting at moving

24    vehicles?

13:38 25        A    Absolutely.

30

1      Q    Okay.

2      A    -- and he said he didn't know.

3      Q    Okay.  But in any event, your understanding

4  from reading Sergeant Cleveland's deposition that

13:47  5  the idea was to follow the vehicle, report as to its

6  location, wait for backup units to arrive, and then

7  try to effectuate a stop on the vehicle once the

8  backup units were there?

9      A    Correct.

13:47 10      Q    Okay.  And did you think, generally

11  speaking, that was a good plan?

12      A    It was an excellent plan.

13      Q    Okay.  And is the vehicle that the officers

14  were driving, was that a marked unit like we see in

13:48 15  normal patrol units or something a little bit

16  different?

17      A    It was something a little bit different.

18  It was a dark-colored Ford Taurus.  It didn't have

19  an -- what they call "outside" or "overhead" light

13:48 20  bar on it, and obviously, there were no insignias on

21  the side of the car.  It just basically had light

22  bars inside on the front deck and on the rear deck,

23  forward facing red/blue lights, and in the rear

24  deck, amber lights.

13:48 25      Q    Okay.  Now, based on your review of the

39

1    materials, before the vehicle got to the general

2    location when -- where the shooting happened which

3    we'll talk about in a moment, did you think it would

4    have been appropriate to -- for the officers to fire

13:48  5    shots at the vehicle just as it was -- was moving

6    away from them going down these various streets?

7        A    No, it wasn't appropriate.  I think we

8    discussed there is a policy in CHP under Manual

9    Section 70.6 that specifically states thou shalt not

13:49 10    shoot at fleeing vehicles.

11        Q    Okay.  Did the officers, based on your

12    review of the materials, have any information that

13    the occupant or occupants of the vehicle had a gun

14    or -- or other weapon?

13:49 15        A    There was no information to that in that

16    regard, no.

17        Q    Any information that they had committed a

18    serious crime involving injury to anybody?

19        A    An attempted injury, but no completed

13:49 20    injury.

21        Q    Okay.  You're talking about when they

22    reversed in the parking lot where Sergeant Cleveland

23    was making a U turn?

24        A    As they were attempting to leave, yes.

13:49 25        Q    Was there any contact between the vehicles

40

1      Q    Okay.  Do you have an understanding,

2    independent of what he thought, what the distance

3    was from the driver's side of his vehicle to the

4    west curb?

14:14  5      A    Yes, because when I went there, I parked my

6    car in proximity of where his car was by looking at

7    the photographs, and I kind of marked it off, and it

8    looked like it was about 10 feet, 10/12 feet,

9    depending on, you know, what I could tell at the

14:15 10    time.  I didn't have a Ford Taurus.

11      Q    Did you -- in your report, did you include

12    any of the measurements?

13      A    Oh, no.  No.  No.  That's outside of my

14    realm of expertise.  I left that to the --

15      Q    Okay.

16      A    -- engineering guys.

17      Q    Okay.  So based on your review of the

18    materials, was there enough room between the

19    driver's side of Sergeant Cleveland's vehicle and

14:15 20    the west curb for the truck to pass through?

21      A    Yes.

22           You're asking me?

23      Q    Yes, I am.

24      A    My estimation is you can get an 18-wheel

14:15 25    Mack truck down that street without hitting the CHP

61

1    car.

2          Q    Okay.    When you say an 18-wheel Mack truck

3    down the street, just to make sure we're on the same

4    page, are you talking about in the space between the

14:16  5    driver's side of Sergeant Cleveland's car on the

6    west curb?

7          A    Yes.

8          Q    Okay.  And do you think it was appropriate

9    for Sergeant Cleveland to position his vehicle in a

14:16  10    place where there was enough room for the truck to

11    continue to flee if that's what it chose to do?

12          A    Oh, yes.  I mean, you could see -- you

13    asked me earlier what was the direction or the

14    attitude of the CHP car.  He actually positioned his

14:16  15    car to the northeast, and he's closer to the east

16    curb which would allow traffic to go by him as

17    opposed to sitting in the middle of the street.

18          Q    Okay.  So would you, at least, agree that

19    two tactical decisions that Sergeant Cleveland had

14:16  20    to make was, one, where to position his car and,

21    two, to get out of his car?

22          A    I think that, Counsel, I think that is so

23    critical because I would be critical of those

24    officers if they put their car in a position in the

14:17  25    middle of that street that forced them into a

62

```
 1    on the truck from whatever the distance was, 15 to

 2    25 feet on the passenger side of the truck, do you

 3    have any opinion as to whether that light could have

 4    potentially illuminated someone sitting in the front

14:22 5    passenger seat?

 6          A   I have no way of knowing.

 7          Q   Okay.  But, at least, at that point, would

 8    you agree, as the truck backed up, the passenger

 9    side would be closer to Sergeant Cleveland than the

14:22 10   driver's side?

 11         A   Yes.

 12         Q   Okay.  And I think he indicated that he was

 13   looking at the passenger side of the truck when it

 14   reversed?

14:22 15        A   Yes.

 16         Q   And you would agree, I take it, that it

 17   would not be appropriate to shoot at the truck as it

 18   was reversing?

 19         A   Correct.

14:22 20        Q   And would it be a fair assumption on behalf

 21   of an officer that, when they saw the vehicle

 22   reversing, that there was a likelihood that the

 23   driver was going to try to flee or get away at that

 24   point?

14:23 25        A   That's not a fair assessment.  That's an
```

67

1    in order to get into that space; is that -- between

2    the driver's side of Sergeant Cleveland's vehicle

3    and the west curb?

4        A    Correct.

14:28 5        Q    And you believe that space, at least from

6    going to the scene, you're -- even though you're not

7    an expert in the measurements, it's something more

8    like 10 or 12 feet?

9        A    Yeah.  It may have been 15.  I don't

10   know --

11       Q    Okay.

12       A    -- I didn't have a tape measure.

13       Q    Okay.  And would you agree that officers

14   are trained that if a vehicle appears to be

14:28 15  potentially moving in your -- in their direction,

16   then they should do whatever they can to get out of

17   the way?

18       A    If they can, absolutely.

19       Q    And, in fact, do you recall

14:28 20  Sergeant Cleveland saying that he felt the quickest

21   way for him to get out of the way of the vehicle was

22   to go to the west curb?

23       A    Yes.

24       Q    And, in fact, he said he was able to get

14:29 25  there within a couple seconds?

72

1      A    Yes.

2      Q    Okay.  Because -- do you remember I asked

3  him, you know, "Did you consider going to the rear

4  of your vehicle or to another spot," and you recall

14:29  5  that discussion?

6      A    I think that was a great question by you.

7      Q    Oh, well, I finally asked one.

8      A    You ask many of them -- most of them are

9  great questions.

14:29 10      Q    Why did you think that was a good question?

11      A    Because for Sergeant Cleveland to go to the

12  east curb, he would literally have to turn his back

13  or either run backwards in the dark of night on

14  pavement he was not accustomed to to get around the

14:29 15  trunk of that Ford Taurus to get over to the other

16  side.  Both of those options are undesirable.

17          Police officers are not to turn their back

18  and try to run away.  You're not going to -- you're

19  not going to outrun a car, and No. 2, in a

14:29 20  potentially deadly threat situation or a threat

21  situation, officers are not to run backwards in the

22  dark over pavement that they're not familiar with.

23  Those are the two things, and I think

24  Sergeant Cleveland brought those up.  Those are the

14:30 25  two things that he did not want to do, so when you

73

```
 1   directions correct?

 2         A   I finally got it back.

 3         Q   Okay.  And so Sergeant Cleveland is

 4   standing slightly outside the open driver's door.

 5   The truck is reversing, and when the truck is

 6   reversing, it would be going west; is that correct?

 7         A   The rear end of the truck would be going

 8   west, correct.

 9         Q   Okay.  And based, at least, on

10   Sergeant Cleveland's deposition testimony that he

11   thought, as an option, that when he saw it reversing

12   that the truck was maybe going to continue to flee

13   or try to get away?

14         A   Correct.

15         Q   Which you thought was a reasonable option

16   to consider?

17         A   Absolutely.

18         Q   And if the truck was to leave, and we

19   talked about this already, I believe, there was

20   space between the driver's side of

21   Sergeant Cleveland's vehicle and the west curb?

22         A   Yes.

23         Q   And, obviously, if an officer thought the

24   truck was going to leave in that space, an officer

25   wouldn't want to stand in that space; is that fair?
```

77

1        A    Correct.

2        Q    Okay.  So if, hypothetically,

3    Sergeant Cleveland, when he saw the vehicle

4    reversing and thought that an option was the vehicle

14:46   5    was going it pull forward through this space that he

6    was standing in, and if Sergeant Cleveland, at that

7    time while the vehicle was reversing, decided to get

8    out of the area of that space and go to the west

9    curb, would you have been critical of that?

14:46  10        A    No.  I mean, that would have been an option

11   for the sergeant to do, yes.

12        Q    Okay.  And assuming, hypothetically, that

13   Sergeant Cleveland got to the west curb before the

14   vehicle ever starting pulling forward, at least, in

14:47  15   my hypothetical, would you, at least, then, agree

16   that it would have been inappropriate for

17   Sergeant Cleveland to shoot at the vehicle?

18        A    Absolutely, because based on what you've

19   just established, if Sergeant Cleveland had gotten

14:47  20   to the west curb and Mr. Villanueva had turned that

21   truck around and proceeded at one to two miles an

22   hour southbound down Pritchard, the officers would

23   stay -- stand there and watch him leave.

24        Q    Okay.  And that's what they should do based

14:47  25   on their training?

78

```
 1  side?

 2       A   It wouldn't be front.  It would be side.

 3       Q   Side.  Yeah, you're right --

 4       A   Yeah, of the front seat.  The side window

 5  to the front seat.

 6       Q   Correct.  Okay.  So would you at least

 7  agree that when Sergeant Cleveland fired those

 8  shots, he would have been on the passenger's side of

 9  the vehicle when he fired?

10       A   Yes.

11       Q   Okay.  And in your mind, do you think being

12  on the passenger's side of the vehicle when he fired

13  would be consistent with him being on the west curb?

14       A   Not on the west curb, no.

15       Q   Why not?

16       A   He would be going towards the west curb.

17       Q   Why would it be inconsistent with him being

18  on the west curb is what I'm saying, and maybe it's

19  beyond your area of expertise in terms of the

20  trajectory.

21       A   Yeah, I mean, it's -- it wouldn't be

22  inconsistent, but it wouldn't necessarily be

23  consistent because, as we stated before, no one

24  knows exactly where Sergeant Cleveland was.  No one

25  knows exactly where that truck was, and no one knows
```

80

```
 1    exactly the position of the truck and

 2    Sergeant Cleveland when he fired those rounds.  I

 3    can't tell you that he was on the west curb.  I can

 4    tell you that he was moving towards the west curb

14:49  5    and that the -- Mr. Villanueva's truck was actually

 6    moving southeast.

 7         Q    Away from the west curb?

 8         A    Away from the west curb.

 9         Q    Towards the -- towards the --

14:50 10    Sergeant Cleveland's vehicle?

11         A    Yes.

12         Q    It ended up rolling into the vehicle?

13         A    Well, rolling --

14         Q    Striking the vehicle?

14:50 15         A    -- or striking -- yeah, there you go.

16    Striking the vehicle.

17         Q    There's some dispute as to the speed; is

18    that fair?

19         A    And the condition of Mr. Villanueva as

14:50 20    opposed to whether he coasted into the vehicle or he

21    intentionally struck the vehicle.

22         Q    Let me ask you this:  Is -- is part of the

23    training with respect to shooting the driver of a

24    moving vehicle that striking the driver or shooting

14:50 25    at the driver of a moving vehicle could potentially
```

81

1    disable the driver?

2         A    Well, I think a bullet impact would disable

3    anybody whether you're driving or not, so yes, that

4    would -- it would follow that if you get shot,

14:50 5    you're going to more than likely be incapacitated to

6    some degree.

7         Q    And are officers trained that that could

8    potentially put either officers or the public in

9    danger if you have a disabled driver driving?

14:51 10        A    Well, they're not trained that way.  It is

11    a cautionary inclusion into every police policy

12    because it is a reality.  Anyone being shot is going

13    to have less ability to control their physical

14    movements in what they want to do, but what's --

14:51 15    what's important, to consider that, we cannot place

16    the concept of a person who is driving a vehicle is

17    going to be incapacitated to the point where that

18    vehicle becomes dangerous to the officers or the

19    general public.  What officers are trained under

14:51 20    deadly force policy is whether the movements of the

21    weapon or the assaulting vehicle are intentional or

22    accidental.

23         If the driver has been incapacitated by a

24    bullet shot, anything that happens past that

14:52 25    incapacitation is accidental and unintentional.

82

1  What we're talking about is the perception of the

2  officers on an intentional act.  So what's more

3  important?  I want, as an officer, to stop an

4  intentional assault as opposed to something that may

14:52  5  be unintentional and not under force and power.

6       Q   Okay.

7       A   That is very important to consider as to

8  the damage that vehicle is going to do because the

9  vehicle is not being steered.  It's not being

14:52  10  controlled.  It's not being navigated.  It's

11  actually got a person there who's incapable, and so

12  at some point in time, it's got to stop.  If the

13  person is intentionally operating the vehicle, it's

14  not going to stop.  It's going to keep going.

14:52  15       Q   Right.  But in this case, is it your

16  understanding, according to the testimony of the

17  officers, that all the shots occurred before the

18  vehicle made impact with Sergeant Cleveland's

19  vehicle?

14:53  20       A   According to the officers, yes.

21       Q   Okay.  And is it your understanding --

22  clearly, in order for the vehicle to go through that

23  path, it ended up in a position somewhat different

24  than going through that -- that space between the

14:53  25  driver's side of Sergeant Cleveland's vehicle and

83

```
 1   the curb?
 2        A   That is correct.
 3        Q   And one thing I'm sure you considered is
 4   that the car may have ended up going in that
14:53 5   direction because, at some point, the driver was
 6   disabled from the shots?
 7        A   It could have been at some point, but I
 8   don't know at what point in the trajectory of that
 9   truck was Mr. Villanueva incapacitated that he was
14:53 10   no longer putting that truck under power towards the
11   officers.
12        Q   Okay.  Do you recall anything in reviewing
13   Mr. Orozco's testimony as to whether or not any of
14   the initial shots had struck Mr. Villanueva?
14:54 15        A   Mr. Oruzco -- Orozco -- there's two:
16   There's Abel Orozco, and there's Francisco Orozco --
17        Q   I wanted --
18        A   -- both of them are witnesses so --
19        Q   I wanted to refer to the one who was in the
14:54 20   vehicle.
21        A   That would be Francisco.  Francisco is
22   interesting because he gives three accounts of the
23   incident, but if you're talking about his
24   deposition?
14:54 25        Q   Yes.  So here's my question, and I didn't
```

84

1   want to go through a whole litany of your thoughts

2   on his credibility.  Generally, experts aren't

3   allowed to do that, but I understand.  I wanted to

4   limit it to the question, "Did Mr. Orozco, based on

14:54 5   your review of -- whether it's his deposition/his

6   statement -- have an impression as to whether or not

7   some of the initial shots struck Mr. Villanueva?"

8        A    Yes.

9        Q    Okay.  And do you recall "Sergeant"

14:55 10  Henderson saying that he believes he started

11  shooting before he heard any shots from

12  Sergeant Cleveland?

13       A    Well, Officer Henderson did say that, yes.

14       Q    And do you recall Sergeant Cleveland saying

14:55 15  that he heard shots before he fired -- ever fired

16  any shots?

17       A    Yes, but I don't think they're very sure of

18  exactly that happening, but that's what they said.

19       Q    Okay.  And so one scenario could be that

14:55 20  after the vehicle backed up and impacted the Honda

21  and it was intending to -- to move forward and turn

22  into the space between the driver's side of

23  Sergeant Cleveland's vehicle and the west curb, one

24  or more shots struck Mr. Villanueva, and he was

14:56 25  unable to get the car into that space, and the car

85

1    ended up kind of moving into the parked vehicle; is

2    that fair?

3        A    No.   I think -- I mean, you cautioned me

4    that experts cannot opine on veracity, and that's

14:56  5    true.   I think that there's no coroner in the world

6    that's going to tell you the -- the progression of

7    shots.   Most coroners can't tell you which shot hit

8    first, which shot hit second.

9            Now, there's certain things that we can

14:56 10    assume based on the position of the officers, but

11    the sequence of shots and the sequence of shots that

12    hit Mr. Villanueva, looking at all this, I don't see

13    anything that addresses which round hit him first.

14        Q    No.   I agree with you there.   I wasn't

14:56 15    trying to say if it was a particular round.   I was

16    just trying to say if it was any round that struck

17    him.

18            Let me ask it in a different way.

19        A    Okay.

14:57 20        Q    You -- you indicated, based on your review

21    of the materials, that Sergeant Cleveland was

22    running to the west curb?

23        A    Yes.

24        Q    Okay.   And you indicated that the vehicle,

14:57 25    the truck as it was approaching Sergeant Cleveland's

86

1    vehicle, was moving in a direction away from the

2    west curb?

3         A    Correct.

4         Q    So the front of the truck was moving in a

14:57 5    direction away from the west curb where

6    Sergeant Cleveland was running to; is that fair?

7         A    That's a fair statement.

8         Q    Okay.  And I'm just wondering if you had an

9    impression as to why.  In other words, did you have

14:57 10    an impression, from reviewing the materials, as to

11    why the truck ended up -- instead of going through

12    that space -- and ended up impacting the --

13    Sergeant Cleveland's vehicle?

14         A    If you're asking me why, my response would

14:57 15    be because Mr. Villanueva was trying to kill

16    Sergeant Cleveland.

17         Q    Well, the -- this is the part that I'm

18    having an issue with.  This is why I ask:  He's

19    actually driving a vehicle in a direction away from

14:58 20    Sergeant Cleveland.  Sergeant Cleveland is running

21    to the west curb.  The vehicle is not going towards

22    the west curb or tracking Sergeant Cleveland in any

23    way.  In fact, it's going in the opposite direction;

24    correct?

14:58 25         A    Correct.

87

1          Q    Let me ask you this hypothetical:    Let's

2    assume that Sergeant Cleveland had made it to the

3    west curb before the truck started moving forward.

4    This is my hypothetical --

14:58  5          A    Hypothetical.    Right.

6          Q    Then would you agree the shots would have

7    been inappropriate and excessive under that

8    hypothetical?

9          A    Under that hypothetical, if

14:58 10   Sergeant Cleveland was not in danger of his

11   well-being or his life, there'd be no justification

12   for any shots.

13         Q    Okay.    Because under that hypothetical,

14   Sergeant Cleveland was not in the path of the

14:59 15   vehicle when it started to move forward?

16         A    He would be under no danger.

17         Q    Okay.    Let me give you another

18   hypothetical, and let's assume that

19   Sergeant Cleveland started moving or running to the

14:59 20   west curb just as the vehicle started to move

21   forward and was able to get to the west curb maybe

22   after the vehicle started moving just a few feet

23   forward.

24              Do you understand my hypothetical?

14:59 25         A    Yes.

88

1       Q    Then -- and then under that scenario, would

2  you say the shooting would be inappropriate?

3       A    Not if -- no.   Not if Sergeant Henderson --

4  Cleveland was not in danger, no.

14:59  5       Q    It would not be appropriate?

6       A    At no time would a shooting be appropriate

7  if the officers are out of the path of danger.

8       Q    Okay.   So -- and that gets into what we

9  spoke about before.   You'd have to have that

15:00 10  immediate threat of death or serious bodily injury

11  and an inability to get out of the way?

12       A    Yes.

13       Q    Okay.   Now, from Officer Henderson's

14  perspective.

15:00 15       A    Okay.

16       Q    You reviewed his deposition?

17       A    Yes, I did.

18       Q    And did Officer Henderson specifically

19  know, according to his deposition testimony, where

15:00 20  Sergeant Cleveland was during the time he was firing

21  these 12 shots?

22       A    I believe he stated in two parts -- two

23  points in his deposition.   He says that one time he

24  sees him out of his periphery vision to his left.

15:00 25  He assumes an isosceles shooting position -- I'll

89

 1    Three/five seconds?  Three or four seconds --

 2    Sergeant Cleveland is not going anywhere.  That's

 3    why he -- that's why Officer Henderson testified, "I

 4    generally knew where he was."

15:03  5         Q    Well -- okay.  You get the three to four

 6    seconds just from the 12 shots?

 7         A    From the 12 shots, and I think --

 8         Q    Right.  And so --

 9         A    Okay.  Go ahead.  I'm sorry.

15:03 10        Q    Well, I'm sorry.

11             Did you finish your answer?

12        A    Yeah, I'm done.

13        Q    Okay.  So assuming that's correct, and I

14   think Sergeant Cleveland said it just took him a

15:04 15  couple seconds to get to the west curb?

16        A    Exactly.

17        Q    Okay.  And so if the 12 shots happened

18   from -- from Officer Henderson before the impact

19   between the truck and Sergeant Cleveland's vehicle;

15:04 20  right?

21        A    Okay.

22        Q    So the car was moving forward for at least

23   three to four seconds before the -- the impact.  Is

24   that fair just putting those two --

15:04 25        A    Yeah.  I mean, in an estimate.  I mean, I

                                                           92

1    would not want to get nailed to three to four

2    seconds.  Nobody knows.  I think at some --

3        Q    Well, he had to get off --

4        A    -- somebody said five seconds.

15:05  5    Q    Right.  But he had to get off 12 shots;

6    right?

7        A    He had to get off 12 shots.

8        Q    And, according to them, before the impact?

9        A    According to them, before the impact, yes.

15:05 10    Q    So, and then we talked about the distance

11    before, 15 to 25 feet?

12        A    Yes.

13        Q    And I take it you didn't do any

14    calculations as to how fast a car would have to be

15:05 15    moving to -- to move 15 or 18 feet in four or five

16    seconds?

17        A    I didn't take those classes in college, no.

18        Q    Okay.  That was smart of you.

19            Did you have an understanding from

15:05 20    reviewing the materials whether the driver's side

21    door of Sergeant Cleveland's vehicle was open or not

22    at the time of the shooting?

23        A    I assumed that it was.  He got out of the

24    car.  He doesn't have any recollection of whether

15:06 25    the door was closed or not, and I know you're

93

1  getting to the crime scene photographs, and I think

2  the door was closed, and -- and so I don't think the

3  question was ever answered as to who closed the

4  door.  We know it was open at one time.  He had to

15:06  5  get out of the car.

6        Q    Right.

7        A    And he testified he was standing a little

8  behind the V of the car, so we know it was open.  At

9  some point in time, the door got closed.

15:06  10        Q    I guess, what I'm wondering, do you know

11  from any evidence you reviewed whether or not the

12  truck ever impacted that door?

13        A    I don't know.

14        Q    And I think I've already covered this with

15:07  15  you with Officer Henderson, but I asked him, "Would

16  it be correct that you did not look to see where

17  your partner was during the shots," and he said,

18  "Yes."

19        A    That's correct.

15:07  20        Q    But that's your understanding.  He did not

21  look to see --

22        A    No.

23        Q    -- where Sergeant Cleveland was during the

24  shots; is that correct?

15:07  25        A    No, he did not look to his left.  He

94

1      A    My point exactly.

2      Q    Okay.   That's fair enough.

3           Was it -- did you have an understanding as

4    to whether Sergeant Cleveland issued any commands

15:08 5    after getting out of the car but before he fired?

6      A    I'm really unsure on that.   I know that

7    Officer Henderson issued commands, and there's some

8    witnesses that hear commands with a certain flavor

9    of profanity involved in that.   I don't know if

15:09 10   Sergeant Cleveland said whether he did or not.   I'm

11   not really sure.   I think he doesn't really

12   remember, but he thinks he did.

13     Q    How about Officer Henderson?

14     A    Officer Henderson, I think he believes -- I

15:09 15   believe that he said that he issued commands, and

16   like I said, there are witnesses that hear commands

17   to -- to stop.

18     Q    Any -- with terms of profanity, do you have

19   any professional opinion as to whether or not

15:09 20   officers should try to avoid using profanity when

21   they can?

22     A    Officers should try to avoid using

23   profanity when the situation is static and contained

24   and stable.   Officers should never disparage their

15:09 25   oath of office or their position by calling people

96

1    out of their name.

2         We were taught in the sheriff's department

3    that in volatile situations, sometimes that

4    communicates the intent of the officer more clearly

15:10 5    because it's street jargon, and so profanity is not

6    always prohibited.  In deadly force situations, if

7    profanity can stop the use of deadly force or shots

8    being fired, I tell my officers, "Let it go if

9    that's what you think can communicate your intention

15:10 10   to get an individual to stop -- to cease assaultive

11   behavior."

12        So profanity played no part in this case in

13   my review.  Being a sheriff's commander, a station

14   commander, and a chief of police, it played no part

15:10 15   in it.

16        Q   If, hypothetically, Sergeant Cleveland,

17   before he fired, was out of the path of the car --

18   you're already saying he should not have fired; is

19   that correct?

15:10 20        A   That's correct.

21        Q   And do you have any opinion with respect

22   to -- assume hypothetically for purpose of the

23   hypothetical --

24        A   Mm-hmm.

15:10 25        Q   -- that Sergeant Cleveland was looking when

97

1  he fired into the passenger's side of the car and

2  saw someone sitting in the front passenger seat,

3  would that be a factor that you think an officer

4  should consider when deciding whether to fire

15:11  5  through that window at the driver?

6         A    Absolutely.    In that hypothetical, yes.

7         Q    And why would that be?

8         A    Because if the officer is standing to the

9  side of the car where he can see the passenger is

15:11 10  sitting in the passenger seat, that means the car is

11  beyond him.    The car is not threatening him.    That's

12  No. 1.

13             Number 2, why would he shoot the passenger?

14  The passenger is not controlling the vehicle.    I

15:11 15  don't think there's any dispute with anyone that at

16  that particular point set up by the constructs of

17  your hypothetical that it would justify a shooting

18  by any officer.

19         Q    So we talked about background.    Would

15:12 20  sometimes the -- I don't know if I'm using the right

21  term -- the foreground have to be considered when

22  shooting?

23         A    Sure.    All your surroundings.    You need --

24  the officer needs to be cognizant of everything

15:12 25  around him and everything that's involved, and like

98

1  There's kids everywhere all the time.

2      Q    Right.  I'm just wondering -- I mean,

3  sometimes, wouldn't it be difficult for officers to

4  know whether or not kids are in the line of fire?

15:13  5      A    Not in that situation.  If you're going to

6  be killed and I'm an officer and I'm about to be

7  killed by a truck and I don't see any kids and I

8  have reason to believe there's probably no kids out

9  on the runway of an airport -- whether they knew it

15:13 10  or not, it's actually a dark abyss out there at

11  night -- then there would be no requirement to

12  consider that even though there's kids on the

13  sidewalk.  They're not in the line of fire.

14      Q    Is that essentially the issue, so about to

15:14 15  be -- I guess it would be about to be killed or run

16  over by the truck and unable to get out of the way?

17      A    There's no other reason/justification to

18  fire deadly force.  We've gone over that with the

19  Post Training 20, and we've gone over that with the

15:14 20  CHP policy.  If there is no threat to life, there is

21  no justification for shooting.

22      Q    So would you agree that, generally

23  speaking, if you were talking about whether the

24  facts of this case or generally shooting at a moving

15:14 25  vehicle, if the officer was not in immediate danger

100

1    of being run over and/or the officer was able to get

2    out of the way, then the officer should not shoot?

3         A    Yeah.    And that's the ultimate question in

4    this case.    That's for the trier of fact.    That is

15:14 5    what this case is going to come down to.

6              MR. GALIPO:    Okay.    Is it okay if we take a

7    short break?

8              MS. DEAN:    Sure.

9              THE VIDEOGRAPHER:    Off record, 3:15.

15:16 10             (A recess was taken.)

11             THE VIDEOGRAPHER:    Back on the record,

12    3:20.

13    BY MR. GALIPO:

14        Q    You don't hold yourself out as a human

15:21 15    factors expert, do you?

16        A    No.    I've answered questions on humans --

17    human factors.    Dennis Gonzalez has had me -- asked

18    me a few questions.    I'm not a trained human factors

19    person, but I've had courses through William

15:21 20    Lewinski's institute on human factors, so I did -- I

21    have had training in it, but I'm not formally

22    educated.

23        Q    Okay.    Some of this we've already covered,

24    and I think your testimony is very consistent in

15:21 25    some respects with Sergeant Cleveland's deposition

101

1   testimony.  You recall Sergeant Cleveland, in his

2   deposition, saying if you -- if you -- if a vehicle

3   is coming in your direction, you should get out of

4   the path?

15:21 5          A    Yes.

6          Q    And you agree with that?

7          A    Oh, absolutely.

8          Q    And if you can get out of the path, you

9   should not shoot?

15:22 10         A    That's correct.

11         Q    And you agree with that?

12         A    Yes.

13         Q    And he felt his easiest -- the easiest

14   direction for him to get out of the path was going

15:22 15   to the west curb line?

16         A    Correct.

17         Q    And you agree with that?

18         A    Yes.

19         Q    And he indicated, and I think you've said

20   similar today, if the vehicle is not about to strike

21   you, you should not shoot?

22         A    That is correct.

23         Q    And if you're able to get out of the way,

24   you should not shoot?

15:22 25         A    That is correct.

102