1             IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    --------------------------------

     ARMANDO VILLANUEVA AND HORTENCIA)

5    SAINZ, INDIVIDUALLY AND AS      )  **ORIGINAL**

     SUCCESSOR IN INTEREST TO PEDRO  )

6    VILLANUEVA, DECEASED, AND       )

     FRANCISCO OROZCO, INDIVIDUALLY, )  Case No.

7                                    )  8:17-cv-01302

               Plaintiffs,           )  JLS (KESx)

8                                    )

          vs.                        )

9                                    )

     STATE OF CALIFORNIA; JOHN       )

10   CLEVELAND; RICH HENDERSON AND   )

     DOES 1-10, INCLUSIVE,           )

11                                   )

               Defendants.           )

12                                   )

     --------------------------------

13

14

15        DEPOSITION OF EDWARD C. FATZINGER, JR.

16             Los Angeles, California

17           Thursday, August 23, 2018

18                  Volume I

19

20

21

22

23   Reported by:

     CLAUDIA R. GARCIA

24   CSR No. 12812

     Job No: 2979435

25   PAGES 1 - 77

                                           Page 1

1          A      Probably within the last month.

2          Q      After your report?

3          A      Yes.

4          Q      Okay.  So let's talk about what you did to

5     complete your assignment.  So I'm just going to ask you

6     a broad question.  What did you do to complete your

7     assignment?  And then we'll break it down from there.

8          A      Sure.  Basically, look at the vehicle, the

9     Chevrolet, look at the site, measure it, photograph it,

10    review various reports, investigative reports, and then

11    at that point, start doing my research, start putting

12    together the simulation.  I used a program called PC

13    Crash.

14            So, essentially, what I'll bring is in the

15    investigating officer's measurements, I'll bring in my

16    measurements and sort of scale the scene, if you will,

17    and then bring in the individual vehicles.

18            You can model their length, width, height,

19    things of that nature.  And then you can essentially

20    drive them through the scene.  I can add sequencing as

21    far as accelerating, braking, steering, things of that

22    nature.  So I can move the vehicles in the program, and

23    then when the vehicles overlap, they calculate an

24    impact.

25            So, basically, collected all the information

Page 20

1    on the scene, scaled the programs, brought the vehicles

2    in, and then based on the evidence and the testimony

3    started modeling the various motions of the vehicle.

4        Q    Let's go back to the vehicle inspection, the

5    site inspection.  You did measurements and took photos;

6    correct?

7        A    Yes.

8        Q    Anything else?

9        A    Laser scan both the car and the site, as well

10   as we downloaded the pickup truck for the VIN data

11   recorder.

12       Q    Okay.  And then you said you reviewed reports.

13   Which reports did you review?

14       A    All the investigative reports as well as,

15   again, the testimony, deposition testimony.

16       Q    What deposition testimony did you review?

17       A    The two investigating officers, Cleveland, and

18   I think Hernandez.

19            MR. GARCIA:  Henderson.

20            THE WITNESS:  Henderson.  Sorry.  And then

21   there were the right front passenger, Orozco, and the

22   witness, Hinkle, witness Abel Orozco, and then there's

23   a couple more, I think Sainz and Armando Villanueva.

24   And that's I believe everybody.

25   ///

Page 21

1      A      No.

2      Q      And what testing did you do on your 2017 GMC

3  pickup truck?

4      A      I just documented the idle speed, essentially.

5      Q      And what did you document that idle speed to

6  be?

7      A      My truck was about 2.9 miles an hour.  But I

8  have a different transmission than the subject vehicle.

9  So if you apply the correct ratio difference, it's

10  about 4.2 would be the equivalent on the subject truck.

11      Q      4.2 miles per hour for the idle speed for the

12  subject truck?

13      A      Correct.

14      Q      Did you do any other kind of testing on your

15  own pickup truck?

16      A      No.

17      Q      What literature did you review to find that

18  the Chevrolet Silverado had a turning diameter of 40

19  feet?

20      A      From the manufacturer.

21      Q      Do you have it with you?

22      A      Yes.

23      Q      Can you point it to me in this?

24      A      This pack of pages here (indicating).

25      Q      And just for the record, you've got a --

Page 25

1  well as the witness, Hinkle.  And also obviously where

2  the vehicles came to rest.

3      Q    Okay.  And the next bullet point, the left

4  front of the Chevrolet subsequently collided with the

5  left rear door of the CHP Ford Taurus.  What's that

6  based on?

7      A    Again, that's based on the photographs, the

8  scene photographs.  We see the vehicles at rest.  The

9  damage to the Chevrolet is consistent with that as well

10  as the testimony of those three same individuals;

11  Cleveland, Henderson, and Hinkle.

12      Q    Okay.

13      A    I'm sorry.  I keep forgetting about the right

14  front passenger, Orozco.

15      Q    Okay.  So for four and five bullet points you

16  would include Orozco as the testimony you're basing

17  that on?

18      A    Right.

19      Q    And that's Francisco, not Abel?

20      A    Correct.

21      Q    The next one, the movement of the Chevrolet

22  from impact with the Honda Civic to impacting the CHP

23  Ford could not be done in one maneuver due to the

24  proximity of the vehicles.  What's that based on?

25      A    Right.  That comes down to, again, the

Page 37

1    testimony of Cleveland and Henderson.    Cleveland

2    testified that the pickup truck came back in a more

3    perpendicular fashion.    Also describes it in one of his

4    exhibits, draws it out, how it reversed.

5              Henderson's testimony that it came back and

6    collided with the Honda about 15 to 30, which would be

7    consistent with the low end that I said, 12 to 15 that

8    I modeled initially.    As well as I think the testimony

9    of right front passenger Orozco.

10             The collective testimony is that the Chevrolet

11   maneuver was essentially straight back, not perfectly

12   straight, but in general, straight back.    And for that

13   vehicle to then turn south and impact the Ford the way

14   it did, it would have to make two maneuvers based on

15   the proximity of the Honda and the Ford.

16        Q     Okay.  Did you read in Mr. Orozco's police

17   interview where he talked about that the truck busted a

18   circle, in his words?

19        A     Not necessary -- no, I don't know what that

20   means, busted a circle.

21        Q     Did you --

22        A     I would assume it means a K turn or turn of

23   some maneuver or fashion.

24        Q     Did you hear -- did you read where he said

25   that he turned real quick?

Page 38

1      A      Yes.

2      Q      And did you also read where he gave an angle

3   as closer to 45 degrees when the -- when the truck

4   stopped after the initial reverse?

5      A      I -- my understanding was when the vehicle

6   ultimately moved forward towards the Ford it was at a

7   45 degree angle.  I don't think he made it -- got that

8   specific as to after the Ford impact or not.

9      Q      Did you see any witness testimony indicating

10  that the truck made more than just a reverse move and a

11  forward move?

12     A      Actually Hinkle testifies to it.  He describes

13  the turn as -- oh, here it is -- he says, tried to make

14  a U-ie, in other words, referring to the Chevrolet,

15  tried to make a U-ie, back around, back, went in,

16  backed out, and started coming forward, back again.  So

17  he's describing two reverse maneuvers.

18     Q      Okay.  Is that the only testimony that you saw

19  that -- that supports the -- your opinion that the

20  truck made more than just a one reverse and one forward

21  motion?

22     A      Right.  That's -- that's the only specific

23  testimony.  A lot of it just describes a K turn, which

24  in general doesn't describe how many reverses they are.

25  They just describe it as a K turn.

Page 39

```
 1      A    No.

 2      Q    Is there any EDR data that supports that

 3   number?

 4      A    No.

 5      Q    And then finally you indicate the entire time

 6   from impact with the Honda Civic to impact with the CHP

 7   Ford as roughly 16 to 17 seconds?

 8      A    Right.   Including those reverse maneuvers.

 9   Correct.

10      Q    And the only testimony that corroborates that

11   is the testimony of Mr. Hinkle?

12      A    Mr. Hinkle as well as the other witnesses that

13   say it was making a K turn.

14      Q    Who were those witnesses?

15      A    I believe the right front passenger of the

16   Chevrolet said that it was making a K turn, turning

17   around.

18      Q    Anybody else?

19      A    I don't think anyone gets into it specifically

20   on the details of the actual maneuvers.

21      Q    Did you see Mr. Orozco use the term "K turn"

22   anywhere in his deposition transcript?

23      A    Francisco?

24      Q    Yes.

25      A    He says, We wanted to do a three point turn or
```

Page 50

1    a K turn as you call it.  Yes, so he mentions that.

2         Q    Okay.  In his deposition?

3         A    Yes.

4         Q    Okay.  Did you also read his declaration in

5    support of the summary judgment motion?

6         A    I don't know if I saw that or not.

7         Q    Okay.

8         A    That's what I thought.  Just to correct the

9    record, I think I said a second in between reverse and

10   forward maneuvers.  I actually have about two seconds.

11   And that's basically the time for someone to shift

12   gears and then you have to also factor in the time to

13   turn the steering wheel.

14        Q    Okay.  So when you said one second was the

15   average for somebody to do that kind of maneuver, that

16   was incorrect?

17        A    No.  It's correct for shifting, but I forgot

18   you have to do the steering as well.

19        Q    Okay.  And again, somebody who's in a hurry

20   could do that faster than two seconds; correct?

21        A    If they really wanted to, sure.  Or slower.

22        Q    Okay.  Well, if you're in a hurry you normally

23   wouldn't do it slower, would you?

24        A    No.

25        Q    You also state that the truck was traveling

Page 51

```
 1

 2

 3

 4          I, EDWARD C. FATZINGER, JR., do declare under

 5    penalty of perjury that I have read the foregoing

 6    transcript; that I have made any corrections as appear

 7    noted, in ink, initialed by me, or attached hereto;

 8    that my testimony as contained herein, as corrected, is

 9    true and correct.

10          EXECUTED this _____ day of _____,

11    2018, at _____, _____.
                   (City)                    (State)

12

13

14

15

16          _____

            EDWARD C. FATZINGER, JR.

17

18

19

20

21

22

23

24

25

                                              Page 76
```

```
 1                    C E R T I F I C A T E

 2

 3         I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify;

 5         That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were administered an oath; that a record of

 9    the proceedings was made by me using machine shorthand

10    which was thereafter transcribed under my direction;

11    that the foregoing transcript is a true record of the

12    testimony given.

13          Further, that if the foregoing pertains to the

14    original transcript of a deposition in a Federal Case,

15    before completion of the proceedings, review of the

16    transcript [ ] was [ ] was not requested.

17         I further certify I am neither financially

18    interested in the action nor a relative or employee or

19    any attorney or any party to this action.

20         IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22    Dated: September 12, 2018

23

24

25

              CLAUDIA R. GARCIA, CSR. 12812
```

                                            Page 77