# On-Scene Consulting

June 20, 2018

Mr. Bryan D. Garcia, Esq.
Kiesel Law, LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211

## RULE 26 REPORT

**ARMANDO VILLANUEVA and HORTENCIA SAINZ, INDIVIDUALLY and as successor in interest to Pedro Villanueva, deceased, and FRANCISCO OROZCO, individually, Plaintiffs**
**vs.**
**STATE OF CALIFORNIA; JOHN CLEVELAND; RICHARD HENDERSON; and DOES 1-10, inclusive, Defendants.**
**Case No. 8:17-cv-01302 JLS (KESx).**

Dear Mr. Garcia,

Thank-you for retaining me to analyze and render opinions regarding the July 3, shooting incident involving California Highway Patrol, Southern Division Investigative Services Unit, Sergeant John Cleveland, #16012, and Officer Richard Henderson, #20359 which resulted in the death of Mr. Pedro Villanueva and serious injury to Mr. Francisco Orozco.  Pursuant to the requirements of Rule 26, I have studied reports, tape-recorded interviews, photographs, Fullerton Police Department Documents, California Highway Patrol Documents, Transcriptions of Digitally Recorded Depositions and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Body Camera Footage, (4:16).
2. Body Camera Footage, 999-File 2, (8:25).
3. Body Camera Footage, 999-File 3, (4:49).
4. Body Camera Footage, 999-File 4, (5:28).
5. Body Camera Footage, 999-File 5, (9:40).
6. Body Camera Footage, 999-File 6, (20:49).
7. Body Camera Footage, 999-File 7, (7:53).
8. Body Camera Footage, 999-File 8, (4:27).
9. Body Camera Footage, 999-File 9, (9:07).
10. Body Camera Footage, 999-File 10, (8:32).
11. Body Camera Footage, 999-File 11, (12:18).
12. Body Camera Footage, 999-File 12, (12:55).
13. Body Camera Footage, 999-File 13, (17:47).
14. Axon Body Video, 2016-07-03 2309, (0:34).
15. Axon Body Video, 2016-07-03 2315, (2:16).
16. Axon Body Video, 2016-07-04 0123, (3:51).
17. Axon Body Video, 2016-07-04 0309, (5:22).
18. Axon Body Video, 2016-07-04 0315, (6:34).
19. Axon Body Video, 2016-08-17 0918, (0:34).
20. CHP OIS, (3:06).
21. CHP OIS-File 2, (3:44).
22. CHP OIS-File 3, (7:01).
23. Recorded-Interview of Francisco Orozco, (6:36).
24. Recorded-Interview of Francisco Orozco, File 2, (10:22).
25. Recorded-Interview of Francisco Orozco, File 3, (2:48).
26. Recorded-Interview of Francisco Orozco, File 4, (30:31).
27. Recorded-Interview of Abel Orozco, (5:47).
28. CHP Dispatch Recording, 001967, 160703LA04815-1199, (14:30).
29. On Scene TV, CHP Fatal OIS #2, (2:30).
30. On Scene TV, CHP Fatal OIS, (7:52).
31. 1 Eddie CERT Recording, (0:33).
32. Audio-Recording, 2-0701716R, (19:23).
33. Audio-Recording, Canvass Becerra 2, (10:57).
34. Audio-Recording, Canvass Becerra 1, (3:01).
35. Audio-Recording, Canvass Holford, (27:12).
36. Audio-Recording, Canvass Melynk, (28:47).
37. Audio-Recorded Interview of Brent Sporn, (4:11).
38. Audio-Recorded Interview of Sergeant John Cleveland, (1:01:18).
39. Audio-Recorded Interview of Francisco Orozco Jr., Consent to Search, (10:06).
40. Audio-Recorded Interview of Francisco Orozco Jr., Consent for Medical Records, (4:29).
41. Video: VTS 01 VOB, (11:39).
42. Audio-Recorded Interview of Officer Richard Henderson, (1:00:56).
43. Fullerton Police Department Tape-Recorded Interview, 9372879, (26:39).
44. Fullerton Police Department Tape-Recorded Interview, 12771206-3, (1:01:00).
45. Fullerton Police Department Tape-Recorded Interview, 12771213-3, (1:51).
46. Fullerton Police Department Tape-Recorded Interview, 12771214-3, (0:25).
47. Fullerton Police Department Tape-Recorded Interview, 12771266-3, (4:42).

On-Scene Consulting

48. Fullerton Police Department Tape-Recorded Interview, 12771227-3, (2:20).
49. Fullerton Police Department Tape-Recorded Interview, 12771228-3, (0:48).
50. Fullerton Police Department Tape-Recorded Interview, 12771229-3, (10:08).
51. Fullerton Police Department Tape-Recorded Interview, 12771230-3, (2:16).
52. Fullerton Police Department Tape-Recorded Interview, 12771231-3, (2:22).
53. Fullerton Police Department Tape-Recorded Interview, 12771253-3, (1:05).
54. Fullerton Police Department Tape-Recorded Interview, 12771255-3, (3:17).
55. Fullerton Police Department Tape-Recorded Interview, 12771260-3, (3:41).
56. Fullerton Police Department Tape-Recorded Interview, 12771286-3, (0:43).
57. Fullerton Police Department Tape-Recorded Interview, 12771287-3, (3:21).
58. Fullerton Police Department Transmissions, 16-43654 (RC), (9:08:39).
59. Deposition Transcript, (Rough and Final), of Ben Fillman taken on June 4, 2018.
60. Deposition Transcript, (Rough and Final), of Brian Donnelly taken on June 4, 2018.
61. Photographs, (CHP-00001-129).
62. Photographs, (CHP-00130-196).
63. Photographs, (CHP-00197-207).
64. Photographs, (CHP-00208-226).
65. Photographs, (CHP-00227-248).
66. Photographs, (CHP-00249-395).
67. Photographs, (CHP-00396-427).
68. Fullerton Police Department General Offense, Hardcopy, District Attorney, GO#2016-43654.
69. Photographs, (CHP-00624-849).
70. HPM, 70.6, Chapter 2, Discharge of Firearms, (CHP 01796-1809).
71. HPM, 70.6, Chapter 1, Use of Force, (CHP 01810-1820).
72. HPM, 70.6, Chapter 5, Pursuit Policy and Emergency Vehicle Operations, Revised January 2011, (CHP 01823-1849).
73. Call Log Redacted, (CHP 00980-1565-Portions).
74. Confidential Officer Involved Shooting Investigation, Case No. C16-501-001, (CHP 00925-1375).
75. Office of the District Attorney, D.A. Case, S.A. #16-023, (CHP 01359-1368).
76. Defendant State of California's Responses to Plaintiff Francisco Orozco's Request for Production of Documents, Set One, Case No. 8:17-cv-01302 JLS (KESx).
77. Defendant State of California's Responses to Plaintiff's Armando Villanueva and Hortencia Sainz' Request for Production of Documents, Set One, Case No. 8:17-CV-01302-JLS (KESx).
78. Deposition Transcript and Exhibits of Francisco Orozco taken on May 3, 2018.
79. Deposition Transcript and Exhibits of Abel D. Orozco taken on April 19, 2018.
80. Deposition Transcript and Exhibits of John Cleveland taken on October 20, 2017.
81. Orange County Sheriff's Coroner's Report, Case No. 16-02983-MM, (CHP 01225-1672).
82. Defense Produced Documents, (CHP 001825-001938).
83. Orange County District Attorney's Office, Bureau of Investigation, Index of Exhibits, (CHP 001376-1793).
84. Deposition Transcript and Exhibits of Thomas Ray Hinkle Jr. taken on April 18, 2018.
85. Deposition Transcript and Exhibits of Richard Henderson taken on October 20, 2017.
86. Complaint for Damages, 8:17-CV-01302 JLS (KESx).
87. Stipulated Protective Order, Case No. 8:17-CV-01302 JLS (KESx).
88. Expert Report of David E. Balash, Case No. 8:17-CV-01302 JLS (KESx).
89. Expert Report of Edward C. Fatzinger, Jr., MS, PE, Case No. 8:17-CV-01302 JLS (KESx).

On-Scene Consulting

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."
9. #33: "Arrest and Control."
10. #35: "Firearms/Chemical Agents."

**Overview of the Events:**

On July 3, 2016, at approximately 2250 hours, California Highway Patrol, Southern Division Investigative Services Unit, Sergeant J. Cleveland, #16012, and Investigator R. Henderson, #20359, were involved in an officer involved shooting. Sergeant Cleveland and Investigator Henderson were in an undercover vehicle and were surveilling a 2015 Chevy Silverado after observing the driver (Pedro Villanueva) doing "burnouts." As the Silverado left the swap meet area, Sergeant Cleveland and Investigator Henderson provided directions of travel to the Los Angeles Regional Traffic Management Center (LARTMC) and continued to surveil the vehicle. The driver ultimately turned north on N. Pritchard Avenue from Commonwealth Avenue in the city of Fullerton. This is a narrow residential street that intersects with MacArthur Avenue in a dead-end cul-de-sac. Sergeant Cleveland and Investigator Henderson drove down the street after seeing the Silverado turn east on MacArthur and out of their sight. Once Sergeant Cleveland and Investigator Henderson reached the intersection, they observed the Silverado stopped, facing east and still occupied.

Mr. Pedro Villanueva backed his vehicle in a westerly direction and the rear of the Silverado struck the left side of a parked passenger vehicle. Sergeant Cleveland and Investigator Henderson exited their vehicles with their handguns drawn, Sergeant Cleveland on the driver's side and Investigator Henderson on the passenger's side. Sergeant Cleveland and Investigator Henderson were wearing plain clothes with a tactical vest over their shirt with the insignia "Police" affixed to their vests.

As Mr. Pedro Villanueva drove the Silverado slowly in a southerly direction on Pritchard Avenue, Sergeant Cleveland and Investigator Henderson discharged their semi-automatic pistols at Mr. Pedro Villanueva while he travelled at a slow rate of speed. After being mortally wounded, Mr. Pedro Villanueva was unable to operate the Silverado causing it to strike Sergeant Cleveland and Investigator Henderson's undercover vehicle on the driver's side, causing minor damage and coming to a stop.

Mr. Francisco Orozco was ordered to exit the vehicle and he complied without incident. Mr. Orozco was handcuffed.

On-Scene Consulting

Mr. Pedro Villanueva was unresponsive to commands and officers with the Fullerton Police Department approached the vehicle, assessed the driver, who appeared to have multiple gunshot wounds, and removed him from the vehicle. With the assistance of emergency medical personnel on scene from the city of Fullerton Fire Department, medical aid was rendered, however, Mr. Pedro Villanueva subsequently succumbed to his wounds and was pronounced deceased at 2315 hours. Mr. Francisco Orozco was transported to the University of California Medical Center, where he was treated for a gunshot wound to his elbow.

It was determined that Sergeant John Cleveland fired two rounds from his Smith & Wesson, Model 4006, .40 caliber semi-automatic pistol and Investigator Richard Henderson fired twelve rounds from his Smith & Wesson, Model 4006, .40 caliber semi-automatic pistol. It was determined that one round from Sergeant Cleveland's firearm stuck Pedro Villanueva in the right chest area. The round traveled across his chest area before becoming lodged on his left shoulder. One round from Investigator Henderson's firearm struck Mr. Villanueva on the right side of the head. This round became partially lodged in the frontal scalp. Another round struck Mr. Villanueva near the right clavicle area. This round subsequently became lodged on Mr. Villanueva's right posterior scapula.

**Opinions:**

1. It is my opinion that a reasonable Supervisor acting consistently with standard police practices would have formulated an effective and safe tactical plan. It is my opinion that Sergeant John Cleveland failed to formulate an effective and safe tactical plan to conduct a Felony Vehicle Pullover. In addition, it is my opinion based on my review of the facts in this matter, marked black and white police vehicles and a police helicopter were enroute to Sergeant Cleveland and Officer Henderson's location. It is my opinion that Sergeant Cleveland should not have taken any enforcement action as he was operating an unmarked police vehicle and wearing plain clothes. In addition, it is my opinion that Sergeant Cleveland and Officer Henderson should have continued to surveil the red Silverado until marked black and white police vehicles arrived and took control of the vehicle stop. I base my opinion on: <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety while on Patrol.</u>

In addition, I base my opinion on CHP HPM 70.6, (CHP-01832-1833), Pursuit Units: Types of units involved.

(a). A marked black and white patrol vehicle, other than a motorcycle, should take over a pursuit from an unmarked vehicle or Specially Marked Patrol Vehicle (SPMV). When practical, a marked black and white patrol vehicle with overhead emergency lights shall take over the pursuit from a patrol vehicle equipped with only a red spotlight or red spotlight/center mounted red light combination.

According to <u>POST Learning Domain 21</u>, "Officers must approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 22, Chapter 3: High Risk Vehicle Pullovers:</u>

**<u>Officers Reactions:</u>**
- Work as a team,
- Maintain communications with dispatch and other involved officers,
- Move slowly and methodically,
- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary, and
- Exercise emotional restraint and self-control.

**<u>Safety Precautions:</u>**
- Request sufficient personnel and equipment to perform any necessary actions safely and effectively and achieve a psychological advantage over the vehicle's occupants.
- Use available cover and concealment.
- Always maintain a position of advantage.
- Do not rush.
- Guard against being impatient (Time is usually on the officer's side).
- ***Wait for requested backup/assistance to arrive before taking action***.

A number of safety of safety precautions are critical when conducting a high-risk vehicle pullover.

**<u>Utilize Appropriate Resources/Equipment:</u>**
- Request sufficient personnel and equipment to perform any necessary action safely and effectively and achieve a psychological advantage over the vehicle's occupants.
- ***Use marked patrol vehicles to affect the vehicle pullover, if possible, to prevent recognition problems and ensure necessary equipment is available within the vehicle.***

**<u>Maintain Personal Control and Professional Attitude:</u>**
- Do not rush.
- Guard against becoming impatient, (Time is usually on the officer's side).
- ***Wait for requested backup/assistance to arrive before taking action.***

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor. In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment. In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department. In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, <u>I base my opinion on the following facts and testimony in this matter:</u>
- "There is a marked Santa Fe Springs unit enroute, "Copy," (<u>CHP Audio Dispatch Recording, (3:18)</u>).

On-Scene Consulting

- According to CHP PMK Sergeant Brian Donnelly, using a marked black and white police vehicle rather than a plain or undercover vehicle would be safer for the surrounding public, other motorists and the officers themselves, (Deposition Transcript of Brian Donnelly, Page 55).
- According to Witness Abel Orozco, he didn't know the other car was a police vehicle because he didn't see any lights or hear any sirens, (Deposition Transcript of Abel Orozco, Page 20).
- According to Witness Abel Orozco, he thought the red Silverado was being "jacked," (Deposition Transcript of Abel Orozco, Page 35).
- According to Sergeant Cleveland, a high risk or felony vehicle stop is normally done with multiple units, marked units, typically done with units with overhead lights and there is a sequence of commands to safely apprehend people, (Deposition Transcript of John Cleveland, Page 56).
- According to Sergeant Cleveland, he did not have any discussion with his partner about what his tactical plan would be before he got out of the car, (Deposition Transcript of John Cleveland, Page 74).
- According to Sergeant Cleveland, he did not advise other units he was getting out of his vehicle, (Deposition Transcript of John Cleveland, Page 89).
- According to Investigator Henderson, he did not communicate circumstances of the violation to include the "ADW with a Vehicle" while they were pursuing the red truck, (Deposition Transcript of Richard Henderson, Pages 22-23).
- According to Investigator Henderson, he had an understanding that backup was on its way, (Deposition Transcript of Richard Henderson, Page 25).
- According to Investigator Henderson, he knew that Dispatch was working on getting them a helicopter and a Santa Fe Springs marked unit, (Deposition Transcript of Richard Henderson, Page 25).
- According to Investigator Henderson, he agrees if they continued, they could have gotten back in their car and followed the red Silverado until other units and the air-unit arrived, (Deposition Transcript of Richard Henderson, Page 73).

2. It is my opinion that a reasonable Supervisor acting consistently with standard police practices would have discussed Felony Vehicle Pullover Tactics with their partner and responding officers prior to taking action. In addition, it is my opinion based on my review of the facts in this matter thus far, Sergeant John Cleveland failed to discuss Felony Vehicle Pullover Tactics with Investigator Henderson or responding units prior to stopping his vehicle in the middle of N. Pritchard Avenue and exiting. I base my opinion on: California Police Officer Standards and Training (POST), Learning Domain No. 22, Chapter 3: Basic Tactical Considerations for High-Risk Vehicle Pullovers.

It is important to maintain a proper distance between the patrol vehicle and the target vehicle. Officers should be close enough to maintain visual contact with the occupant(s) and/or their activities and position the patrol vehicle an appropriate distance from the target vehicle (two to three car lengths or 20-30 feet).

According to POST Learning Domain 21, "Officers must approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 22, Chapter 3: High Risk Vehicle Pullovers</u>:

**<u>Officers Reactions:</u>**
- Work as a team,
- Maintain communications with dispatch and other involved officers,
- Move slowly and methodically,
- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary, and
- Exercise emotional restraint and self-control.

**<u>Safety Precautions:</u>**
- Request sufficient personnel and equipment to perform any necessary actions safely and effectively and achieve a psychological advantage over the vehicle's occupants.
- Use available cover and concealment.
- Always maintain a position of advantage.
- Do not rush.
- Guard against being impatient (Time is usually on the officer's side).
- Wait for requested backup/assistance to arrive before taking action.

<u>A number of safety precautions are critical when conducting a high-risk vehicle pullover</u>:

**<u>Utilize Appropriate Resources/Equipment:</u>**
- Request sufficient personnel and equipment to perform any necessary action safely and effectively and achieve a psychological advantage over the vehicle's occupants.
- ***Use marked patrol vehicles to affect the vehicle pullover, if possible, to prevent recognition problems and ensure necessary equipment is available within the vehicle.***

**<u>Maintain Personal Control and Professional Attitude:</u>**
- Do not rush.
- Guard against becoming impatient, (Time is usually on the officer's side).
- ***Wait for requested backup/assistance to arrive before taking action.***

In addition, it is my opinion that Sergeant Cleveland and Investigator Henderson should have followed the general guidelines for conducting a safe and effective high-risk vehicle pullover (<u>POST Learning Domain No. 22-Chapter 3: High-Risk Vehicle Pullovers</u>).
I. <u>Develop an Action Plan</u>:
- With officer's partner(s),
- Involved assisting cover units, and dispatch,
- The plan should clearly identify the tactics that will be employed when initiating the pullover as well as throughout the pullover.
- Designate Cover and Contact Officer(s).

II. <u>Initiate the Pullover</u> (Prepare for the pullover by):
- Rolling down patrol vehicle windows, and

On-Scene Consulting

- Unlocking the vehicle's doors,
- Properly position the patrol vehicle an appropriate distance from the target vehicle (Two to three car lengths or 20 to 30 feet).
- Employ appropriate lighting such as (emergency lights, headlights, spotlights, and takedown lights).
- Deploy firearms at the ready.
- Utilize cover and concealment.
- ***Utilize the vehicle Public Address (PA) system to provide direction and commands to the occupant(s) in the vehicle.***

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor. In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment. In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department. In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on the following facts and testimony in this matter:
- According to Sergeant Cleveland, he positioned his vehicle to limit the suspect from going southbound, (Audio-Recorded Interview of Sergeant Cleveland, (34:29).
- According to Investigator Henderson, the vehicle was positioned allowing the red truck to continue southbound on Pritchard, without striking his vehicle, (Audio-Recorded Interview of Investigator Henderson, (41:47).
- According to CHP PMK Sergeant Ben Fillman, stopping a vehicle by blocking them "head-on" is not a typical method of stopping a car. Generally, if they're following someone, they will stop behind them, (Deposition Transcript of Ben Fillman, Page 88).
- According to Sergeant Cleveland, once he stopped on Pritchard Street, he never used his PA system, (Deposition Transcript of John Cleveland, Page 76).
- According to Sergeant Cleveland, the red truck could have passed their vehicle without striking it, (Deposition Transcript of John Cleveland, Page 86).
- According to Investigator Henderson, the PA was never used in this incident, (Deposition Transcript of Richard Henderson, Page 35).
- According to Investigator Henderson, there was enough room for the truck to pass, (Deposition Transcript of Richard Henderson, Page 61).

3. It is my opinion that a reasonable officer acting consistently with standard police practices would not have positioned his vehicle in front of the suspect's vehicle in order to stop any pursuit that might occur. It is my opinion that Sergeant John Cleveland's decision to position his vehicle in front of the suspect's vehicle was a clear departure from training. I base my decision on California Police Officer Standards and Training (POST), Learning Domain No. 22, Chapter 3: Basic Tactical Considerations for High-Risk Vehicle Pullovers.

It is important to maintain a proper distance between the patrol vehicle and the target vehicle. Officers should be close enough to maintain visual contact with the occupant(s) and/or their

On-Scene Consulting

activities and position the patrol vehicle an appropriate distance from the target vehicle (two to three car lengths or 20-30 feet).

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach</u>: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**Cover**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received, (firearm, shotgun, rifle).

**Examples of Cover:**
- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, it is my opinion that Sergeant Cleveland and Investigator Henderson failed to establish Contact and Cover Officers prior to stopping their vehicle. I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific Crimes in Progress, 3-5</u>:

**Establish a Contact Officer and Cover Officers:**

**Contact Officer:**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover must be clear. The **Contact Officer:**
- Conducts the business of the pullover,
- Directs the driver and occupants(s) of the target vehicle,
- Takes necessary actions related to the investigation (e.g., obtaining identification, searching suspects, etc.).

**Cover Officers:**
It is generally the responsibility of any cover officers called to assist the primary officer at the scene of a high-risk vehicle pullover to:
- Protect the primary officer who is conducting the business of the pullover,
- Place their own patrol vehicles in proper position to avoid silhouetting other officers with the vehicle's headlights or other lighting equipment,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

**Communications Between Officers:**

On-Scene Consulting

In order to ensure officer safety and help ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor. In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment. In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department. In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on the following facts and testimony in this matter:
- According to Sergeant Cleveland, directly west of his car, if someone went from the open driver's door area to the curb line, there was a parked car there, (Deposition Transcript of John Cleveland, Page 78).
- According to Sergeant Cleveland, he was not using cover at his vehicle at the time the red truck crashed into the black parked car, (Deposition Transcript of John Cleveland, Page 94).
- According to Investigator Henderson, he got out of his vehicle as it was coming to a stop, (Deposition Transcript of Richard Henderson, Page 34).

4. It is my opinion that a reasonable officer acting consistently with standard police practices would not have acted unprofessionally by directing profanity at Mr. Villanueva. It is my opinion that Investigator Richard Henderson unnecessarily directed profanity at Mr. Villanueva after exiting his undercover police vehicle and while pointing his firearm at the red Chevrolet Silverado containing Mr. Villanueva and Mr. Orozco. It is my opinion that Investigator Henderson violated California Highway Patrol General Order 0.8, Respect- Display a positive and service-oriented attitude towards the public and each other. In addition, I believe there was a departure from Peace Officer Standards and Training (POST).

In addition, I base my opinion on POST Learning Domain No. 22-Chapter 2: Basic Tactical Considerations for Vehicle Pullovers:

Initial Contact: The attitude of the patrol officer can affect the reaction of the driver and the outcome of the vehicle pullover. Officers should make the approach in a businesslike manner while employing effective verbal communication techniques. Flexibility and courtesy are important in making contact with the vehicle occupants. Peace officers should become familiar with communication process for conducting a vehicle stop:
- Remain consistently courteous,
- Sound professional,

On-Scene Consulting

- Center their command presence,
- Defect resistance, and
- Enhance personal safety by allowing time to quickly scan the interior of the vehicle.

In addition, it is my opinion that CHP Investigator Richard Henderson departed from POST Training.  I base my opinion on, **California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states,** "The Law Enforcement Code of Ethics was adopted as a uniform code of ethics to guide the peace officer.  By adhering to the code, officers demonstrate to the community and to their peers that they are honorable and trustworthy."

California Peace Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2-Professionalism and Ethics in Policing:

The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners.  The profession of policy requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served.  Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support.  Peace Officers are held to higher standards then others in the community.  Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense.  It is essential that officers understand the importance of professional behavior.

To embody the spirit of professionalism, ethical conduct must be a way for those in policing.  To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct.  Officers must model and live as examples of the behavior that they are charged to enforce.  The policing community is only strong as its weakest link.  Unethical conduct affects the image and morale of the entire profession and it offends officers and society throughout the country.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits as Primary Officer, Secondary Officer and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on the following facts and testimony in this matter:
- According to Francisco Orozco, he heard someone yell, "stop, stop, throw the fucking keys out, (Interview of Francisco Orozco, File 4, (12:13).
- According to Investigator Henderson, he gave commands, "Police, Stop, Show me your fuckin hands," (Audio-Recorded Interview of Officer Henderson, (40:54).
- According to Witness Lino Mendez, he heard the officer yell, "Stop mother fucker," then gunshots, (CHP 00446).

On-Scene Consulting

- According to Witness Abel Orozco, he heard, "Freeze motherfucker or don't move mother fucker," (Deposition Transcript of Abel Orozco, Page 14).
- According to Investigator Henderson, he stated, "Stop, Police, Show me your hands," (Deposition Transcript of Richard Henderson, Page 36).

5.  It is my opinion that reasonable officers acting consistently with standard police practices would not have exited their undercover police vehicle if they reasonably believed that they were going to be "run over" or the vehicle was going to get away.  It is my opinion that Sergeant Cleveland and Investigator Henderson exercised poor tactics when they exited their vehicle.  I base my opinion on: California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety while on Patrol.

**1-21 Poor or No Planning:**
Sergeant Cleveland and Investigator Henderson exercised poor tactics by abandoning a safe location (their police vehicle), and placing themselves in an "open air environment" that did not afford them any cover.  In addition, it is my opinion that Sergeant Cleveland and Investigator Henderson rushed into the situation without any plan of action, and without considering alternative actions.

Lastly, if Sergeant Cleveland and Investigator Henderson reasonably believed that the red Silverado was going to get away, they should have remained in their vehicle in the event they had to continue to surveil the vehicle until the arrival of marked black and white police vehicles.

6.  It is my opinion that a reasonable officer acting consistently with standard police practices would not have used lethal force in this situation. In addition, it is my opinion that "Shooting at or from Moving Vehicles" which are shots fired at or from a moving vehicle, are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.  An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.  Officers should not shoot at any part of the vehicle in an attempt to disable the vehicle. *Shooting into or From Moving Vehicles* has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed by operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle. It is my opinion that Sergeant Cleveland and Investigator Henderson should not have used lethal force in this matter.  In addition, I base my opinion on the facts and testimony that Sergeant Cleveland and Investigator Henderson were unaware if there were additional passengers in the vehicle.

In addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Lastly, I base my opinion on the following facts and testimony in this matter:
- According to Francisco Orozco, after being shot, Pedro hit the gas pedal and struck the undercover police car, (Interview of Francisco Orozco, File 4, (13:43).
- According to Sergeant Cleveland, the firing happened and then the vehicle struck the car, (Audio-Recorded Interview of Sergeant Cleveland, (42:26).

On-Scene Consulting

- According to CHP PMK Sergeant Ben Fillman, we stress to officers not to put themselves into a position, which forces a deadly threat, (Deposition Transcript of Ben Fillman, Page 55).
- According to CHP PMK Sergeant Ben Fillman, they teach CHP Officers that if you are going to shoot at a vehicle, you cannot anticipate what the driver is going to do. They could step on the brakes, they can mash the throttle. They can change course right or left. Officers need to move right or left, (Deposition Transcript of Ben Fillman, Page 84).
- According to CHP PMK Sergeant Ben Fillman, everybody's primary concern is getting out of the way of the vehicle because you don't know where it's going to end up, (Deposition Transcript of Ben Fillman, Page 88).
- According to CHP PMK Sergeant Ben Fillman, "don't just stand there and shoot. Get off that X, move laterally. Doing otherwise is bad tactics," (Deposition Transcript of Ben Fillman, Page 100).
- According to Witness Abel Orozco, he heard the first two shots and the officer was in front of the truck pointing his gun right at it, (Deposition Transcript of Abel Orozco, Page 18).
- According to Sergeant Cleveland, he was trained not to stand in front of the vehicle and you should do whatever to get out of the way, (Deposition Transcript of John Cleveland, Page 96).
- According to Sergeant Cleveland, he is trained that you shouldn't position yourself where you can be hit by a moving vehicle, (Deposition Transcript of John Cleveland, Page 101).
- According to Sergeant Cleveland, he is trained that by shooting the driver, it could disable the driver and the vehicle could go out of control, (Deposition Transcript of John Cleveland, Page 117).
- According to Investigator Henderson, he is trained that if you find yourself in the path of the vehicle, you should ty to get out of the way if you can, (Deposition Transcript of Richard Henderson, Page 54).
- According to Investigator Henderson, he agrees that if you shoot the driver of the car, you may disable the driver and it may be difficult for him to steer the car and make it difficult to do a number of things, (Deposition Transcript of Richard Henderson, Page 81).

7. It is my opinion that based on my review of the facts and the evidence in this matter, Sergeant Cleveland was not in the path of the red Chevrolet Silverado and was in a position of safety when he fired 2 rounds from his semi-automatic pistol striking and killing Mr. Pedro Villanueva and wounding Mr. Francisco Orozco. In addition, based on my review of the facts in this matter, Investigator Henderson testified that he fired his semi-automatic pistol twelve times fearing that the vehicle would strike Sergeant Cleveland though he did not know where Sergeant Cleveland was positioned. In addition, Investigator Henderson fired 12 rounds from his semi-automatic pistol without assessing between each round which is a deliberate departure from training.

In addition, it is my opinion that Investigator Richard Henderson was responsible for each and every time he pressed the trigger on his semi-automatic pistol and could only do so in Immediate Defense of Life (IDOL). It is my opinion based on the facts in this matter, Investigator Richard Henderson was never placed in an Immediate Defense of Life situation when he fired 12 rounds at Mr. Villanueva and Mr. Orozco.

## On-Scene Consulting

It is my opinion that Sergeant John Cleveland was responsible for each and every time he pressed the trigger on his semi-automatic pistol and could only do so in Immediate Defense of Life (IDOL). It is my opinion based on the facts in this matter, Sergeant John Cleveland was never placed in an Immediate Defense of Life situation when he fired 2 rounds at Mr. Villanueva and Mr. Orozco.

In addition, it is my opinion that Sergeant Cleveland and Investigator Henderson violated CHP Policy on the Use of Firearms. I base my opinion on <u>CHP HPM 70.6 (CHP-01800), Policy on the Use of Firearms:</u>

a. <u>Justification</u>: It is the policy of the California Highway Patrol that an officer may discharge a firearm against a human being or vehicle only under legal authority <u>and</u> only under the following circumstances:

(1). <u>Self-Defense or Defense of Others</u>: When an officer has reasonable belief that the use of deadly force is necessary for self-defense or to defend another person from <u>immediate serious bodily harm.</u>

(a). Included is the use of deadly force while an assault with a deadly weapon (ADW) with a vehicle <u>is actually being committed.</u>

(b). Officers shall not stand and/or step directly in front of or directly behind a vehicle in an attempt to impede its movement (prevent escape), intentionally creating circumstances where the use of deadly force becomes necessary.

(c). **Once an officer no longer perceives a threat, deadly force is no longer justified.**

In addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Lastly, <u>I base my opinion on the following facts and testimony in this matter:</u>
- According to Investigator Henderson, he estimates that the red truck was travelling 10 miles per hour or less as it was heading for Sergeant Cleveland, (<u>Audio-Recorded Interview of Investigator Henderson, (42:12)</u>.
- According to Francisco Orozco, as they were straightening out, the shooting occurred in less than a second, (<u>Deposition of Francisco Orozco, Page 74</u>).
- According to Francisco Orozco, he estimates the truck was going less than five miles per hour at the time of the shooting, (<u>Deposition of Francisco Orozco, Page 78</u>).
- According to Sergeant Cleveland, he did not have any information that anyone in the truck had a weapon, (<u>Deposition Transcript of John Cleveland, Page 62</u>).
- According to Sergeant Cleveland, he did not know how many people were in the truck, the windows were tinted, (<u>Deposition Transcript of John Cleveland, Page 62</u>).
- According to Sergeant Cleveland, he did not know if there were any children in the truck, (<u>Deposition Transcript of John Cleveland, Page 63</u>).
- According to Sergeant Cleveland, he did not believe the red truck was firing at him, (<u>Deposition Transcript of John Cleveland, Page 100</u>).

On-Scene Consulting

- According to Sergeant Cleveland, he has been trained that deadly force is last resort, (<u>Deposition Transcript of John Cleveland, Page 102</u>).
- According to Investigator Henderson, he did not know how many people were in the truck, (<u>Deposition Transcript of Richard Henderson, Page 17</u>).
- According to Investigator Henderson, he did not have the impression that anyone in the truck was firing shots at him, (<u>Deposition Transcript of Richard Henderson, Page 17</u>).
- According to Investigator Henderson, prior to firing his first shot, he did not have any information from any source that anyone had a weapon inside the truck like a firearm, (<u>Deposition Transcript of Richard Henderson, Page 17</u>).
- According to Investigator Henderson, prior to firing his first shot, he did not have any specific information anyone in the tuck had injured anyone, (<u>Deposition Transcript of Richard Henderson, Page 17</u>).
- According to Investigator Henderson, when he fired all of his shots, he did not look where his partner was, (<u>Deposition Transcript of Richard Henderson, Page 68</u>).
- According to Investigator Henderson, he was trained that if you are now on the side of a vehicle, you should not shoot at it, (<u>Deposition Transcript of Richard Henderson, Page 56</u>).
- According to Investigator Henderson, he was not shooting because he thought he was going to be run over, (<u>Deposition Transcript of Richard Henderson, Page 58</u>).
- According to Investigator Henderson, he would have fired all 12 shots even if he knew there was a passenger in the front seat, (<u>Deposition Transcript of Richard Henderson, Page 75</u>).

8.  It is my opinion that a reasonable officer acting consistently with standard police practices and outlined in the <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4</u>, would have given a verbal warning to Mr. Villanueva and Mr. Orozco that they were going to fire their service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts in this matter, Sergeant Cleveland and Investigator Henderson did not give a verbal warning and a reasonable opportunity to comply prior to firing their service pistols.


In addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Lastly, <u>I base my opinion on the following facts and testimony in this matter:</u>
- According to CHP PMK Ben Fillman, officers are required to give warnings when feasible, (<u>Deposition Transcript of Ben Fillman, Page 42</u>).
- According to Witness Lino Mendez, he heard the officer yell, "Stop mother fucker," then gunshots, (<u>CHP 00446</u>).
- According to Sergeant Cleveland, he never gave a warning that he was going to shoot, (<u>Deposition Transcript of John Cleveland, Page 116</u>).

On-Scene Consulting

9.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a departure of from POST Standards Use of Force and Use of Deadly Force Training. I base my opinion on the California Supreme Court opinion in Hayes v. County, 57 Cal. 4th 622 (2013) In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly use of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.

It is my expert opinion that a similarly trained California Highway Patrol Officer would not have considered Mr. Villanueva to be a lethal threat in this set of facts.

10.  It is my opinion that Sergeant John Cleveland and Investigator Richard Henderson's use of lethal force violated their training and caused the death of Mr. Pedro Villanueva and serious bodily injury to Mr. Francisco Orozco,for including but not limited to  the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Officers are responsible for every shot.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Considerations Regarding the Use of Deadly Force**

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by ***the reverence for human life*** and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable*" standard.  The following quotes from POST typifies the training (emphasis added):

On-Scene Consulting

*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20; "Introduction to the Use of Force," pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer 'police powers' on themselves.* These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," pages 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can effect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

## My Qualifications for Reviewing this Case:

My opinions are based on my education, training and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I

## On-Scene Consulting

was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided

On-Scene Consulting

ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus.  I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised 18 K9 Handlers.  Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force incidents.  *I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.*

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers.  I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting).  I

On-Scene Consulting

directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

On-Scene Consulting

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza.  Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule. I have had no publications authored in the past 10 years.

Scott A. DeFoe

On-Scene Consulting